Philip S. Van Der Weele, OSB No. 863650
phil.vanderweele@klgates.com
K&L GATES LLP
One SW Columbia Street, Suite 1900
Portland, OR 97204
Telephone: (503) 228-3200
Facsimile: (503) 248-9085

Kevin A. Adams, *pro hac vice* forthcoming
kadams@mortensontaggart.com
Robert Schultz, *pro hac vice* forthcoming
rschultz@mortensontaggart.com
MORTENSON TAGGART ADAMS LLP
300 Spectrum Center Drive, Suite 1200
Irvine, CA 92618
Telephone: (949) 774-2224
Facsimile: (949) 774-2545

*Attorneys for Plaintiff Lollicup USA, Inc. and
the Proposed Class*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LOLLICUP USA, INC., on behalf of itself and all others similarly situated, <br><br>             Plaintiff, <br><br>     vs. <br><br> LEAH FELDON, Director, Oregon Department of Environmental Quality, in her official capacity, <br><br>             Defendant. | Case No. <br><br> **CLASS ACTION ALLEGATION COMPLAINT** <br><br> **(Declaratory Judgment; Preliminary and Permanent Injunctive Relief)** |

PAGE 1 – CLASS ACTION COMPLAINT

**INTRODUCTION**

1.      Lollicup USA, Inc. ("Plaintiff" or "Lollicup"), individually and on behalf of all others similarly situated, brings this class action against Leah Feldon, in her official capacity, alleging various constitutional violations.

2.      Oregon's Plastic Pollution and Recycling Modernization Act (the "Act" or "RMA"), Oregon Revised Statutes ("ORS") §§ 459A.860–459A.975, is an unprecedented experiment in privatized regulation: it transfers to a single, state-anointed private organization the core regulatory powers of setting fees, classifying materials, granting incentives, conducting audits, and referring noncomplying businesses for civil-penalty enforcement against virtually every company that places packaging, paper products, or food serviceware into Oregon commerce above a threshold size. Together with its implementing regulations, Oregon Administrative Rules ("OAR") Chapter 340, Division 90, the Act conscripts a national supply chain into a state-specific regulatory regime that is opaque, retrospective, unilaterally revisable, judicially unreviewable, and administered by a private actor whose founding members and board are the very industry participants the Act empowers them to regulate.

3.      The mechanism is uniform across the regulated population. Every covered "producer" – defined broadly under ORS § 459A.866 to include brand owners, manufacturers, distributors, wholesalers, and importers – must register with the single state-approved producer responsibility organization ("PRO"), sign that PRO's non-negotiable Oregon Addendum to the Participant Producer Agreement (the "Oregon Addendum"), pay fees calculated under a methodology the PRO has declared confidential, and waive judicial review of every fee dispute in favor of binding arbitration. A producer that resists pays $25,000 per day in civil penalties under ORS §§ 459A.962 and 468.130. There is no opt-out. There is no agency tribunal. There is no judicial review of the fees.

4.      The Act violates the Dormant Commerce Clause. It burdens an inherently national packaging market by compelling nationwide producers to disaggregate Oregon-bound product from interstate shipments, to absorb the risk of double-counting and double-payment for goods

that move through but never come to rest in Oregon, and to retool packaging design, material sourcing, and pricing decisions made entirely outside Oregon to conform to an Oregon-specific classification system. The fees the Act imposes are not user fees in any constitutionally cognizable sense – they fund a brand-new statewide infrastructure that does not yet exist, at rates calibrated by a confidential methodology the PRO itself acknowledges reflects "a high degree of uncertainty in the market share projections" due to "very limited data available," and they fall disproportionately on the participants in interstate commerce least able to pass them through.

5.      The Act also violates the Due Process Clause of the Fourteenth Amendment. The Supreme Court held nearly ninety years ago that a State cannot delegate regulatory authority to "private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). Yet Oregon has done exactly that. The Act vests in Circular Action Alliance ("CAA") – a Delaware nonprofit founded and governed by the largest producers in the regulated industries – the authority to set fees, classify materials, grant and deny incentives, audit producers and assess audit costs against them, and refer producers to the Oregon Department of Environmental Quality ("DEQ") for civil-penalty enforcement. CAA may revise fees, reclassify materials, and adjust incentives unilaterally, without DEQ approval. OAR §§ 340-090-0750(1), (2). Producers receive no meaningful procedural protection: the methodology is confidential, the fees are retrospective, and the sole remedy is binding arbitration under a contract the producer was compelled by law to sign.

6.      The harm to regulated producers is concrete and ongoing. Fees run into six and seven figures annually. Civil penalties accrue at $25,000 per day. Each day Oregon enforces the Act against the producers it covers is another day of compelled adhesion to a private actor's confidential terms and another day in which the constitutional infirmities of the scheme accumulate without any judicial check.

7.      Plaintiff Lollicup USA, Inc. ("Lollicup") is a regulated producer subject to the Act in identical terms to thousands of other producers. CAA registered Lollicup as a participant producer on September 25, 2025. On October 23, 2025, DEQ directly contacted Lollicup to warn

PAGE 3 – CLASS ACTION COMPLAINT

that it was potentially out of compliance and faced "DEQ enforcement action, which may include civil penalties and a compliance order." Between February 4, 2026 and April 21, 2026, CAA issued Lollicup three formal delinquency notices spanning two program years. On February 19, 2026, CAA separately communicated to all producers – including Lollicup – that the NAWD preliminary injunction did not protect producers outside the NAWD membership. On May 13, 2026, CAA escalated Lollicup's file to DEQ for enforcement under ORS §§ 459A.962 and 468.130. Lollicup's 2024 covered-material volume – spanning more than sixty reporting categories – produces a fee exposure that is significant under the CAA fee schedule, with expected exposure comparable or greater each year going forward.

8.      Lollicup brings this action under Federal Rule of Civil Procedure 23(b)(2) on behalf of itself and a class of producers subject to the same Act, the same single PRO, the same retrospective methodology, the same contract of adhesion, the same arbitration waiver, and the same penalty exposure. The challenged scheme operates against every regulated producer in identical terms. The constitutional questions are common to the Class. The relief sought – a declaration that the Act is unconstitutional and an injunction against its enforcement – is, by its nature, indivisible. CAA itself has acknowledged in writing that the producers presently enjoying preliminary protection in this District represent only "a small faction of producers," and that enforcement of the Act will continue against every producer outside that protection.

9.      The constitutional violations Lollicup challenges are not novel. This Court has already held that the same Dormant Commerce Clause and Fourteenth Amendment Due Process claims, brought against the same Defendant and concerning the same Act, raise "serious questions" on the merits and warrant preliminary injunctive relief. *Nat'l Ass'n of Wholesaler-Distributors v. Feldon* ("NAWD"), No. 3:25-cv-01334-SI (D. Or. Feb. 6, 2026), ECF No. 88, at 2 (applying *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011)). The Court found that "[s]erious questions go to the merits of Plaintiff's claims, there is a likelihood of irreparable injury, and the balance of hardships tips sharply in favor of Plaintiff." *Id.*

PAGE 4 – CLASS ACTION COMPLAINT

10.     The preliminary injunction entered in *NAWD* does not, however, protect Lollicup or any other producer who is not a NAWD member. The Court has clarified that the injunction reaches only NAWD members as of February 6, 2026, and that Defendant Feldon "may continue to enforce the . . . Act" against every other regulated producer. *NAWD v. Feldon*, ECF No. 134, at 6 (Apr. 6, 2026). Feldon has confirmed her intent to do so, and CAA has confirmed its intent to continue collecting fees, issuing delinquency notices, and referring non-NAWD producers to DEQ for enforcement. Lollicup and the proposed Class are therefore squarely in the path of the very enforcement that the Court has already found gives rise to serious constitutional questions and irreparable harm – but with no protection.

11.     The Court has expressly recognized the pathway by which producers outside the *NAWD* injunction may obtain relief: "nothing about NAW's case precludes [a non-party producer] from bringing its own constitutional suit challenging enforcement of the Act," and any such producer "may seek to assert an as-applied judgment in its own suit based on offensive, non-mutual issue preclusion." *NAWD v. Feldon*, ECF No. 131, at 5 (Apr. 1, 2026). This is that suit, brought on behalf of Lollicup and every other producer left outside the *NAWD* injunction.

12.     Lollicup seeks (a) a declaratory judgment that the Act and its implementing regulations are unconstitutional under the Dormant Commerce Clause and the Due Process Clause of the Fourteenth Amendment, both on their face and as applied to Lollicup and the Class; (b) certification of the proposed Class under Rule 23(b)(2); (c) a preliminary and permanent injunction restraining Defendant Feldon from enforcing the Act against Lollicup and the Class; (d) waiver of the bond required by Rule 65(c); and (e) attorneys' fees and costs under 42 U.S.C. § 1988.

13.     Lollicup does not seek monetary damages, and Lollicup does not assert any state-law claim. The relief sought is exclusively prospective and federal.

## JURISDICTION AND VENUE

14.     This Court has federal question subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) and (4), which designate district courts as having original jurisdiction over actions

"[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States" as well as actions "[t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights . . . ."

15.     This Court is authorized to grant declaratory and further necessary relief under 28 U.S.C. §§ 2201 and 2202, and to grant injunctive relief under 28 U.S.C. § 1651(a) and Federal Rule of Civil Procedure 65. There is a present and actual controversy between the parties. Lollicup's right to costs, including attorney's fees, is authorized by 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including but not limited to the administration and enforcement of the Act, and the state officials and agencies responsible for administering the challenged law are located within this district.

17.     Assignment to the Portland Division is proper under Local Rule 3-2(b).

## PARTIES

18.     Plaintiff Lollicup USA, Inc. is a corporation organized under the laws of Texas with its principal place of business at 3201 Capital Boulevard, Unit A, Rockwall, Texas 75032. Lollicup manufactures and distributes food serviceware and related products, including polyethylene terephthalate (PET) thermoformed cups and trays, polypropylene (PP) rigid containers, polycoated paperboard cups, small-format plastic items (lids, straws, cutlery), corrugated cardboard, paperboard, and kraft paper. Lollicup operates no facility in Oregon; all Oregon-bound products – including approximately seventeen custom SKUs designed and manufactured exclusively for Oregon-based companies – are shipped in interstate commerce from Lollicup's warehouses in Chino, California. Lollicup is a wholly-owned subsidiary of Karat Packaging Inc. (NASDAQ: KRT). Lollicup is a "producer" within the meaning of ORS § 459A.866 and is subject to the requirements of the Act.

PAGE 6 – CLASS ACTION COMPLAINT

19.     Defendant Leah Feldon is the Director of the DEQ and is sued solely in her official capacity. Leah Feldon acted under color of state law with respect to all acts or omissions alleged herein. DEQ is the state agency charged with administering and enforcing Oregon's environmental protection statutes, including the Act. See ORS § 459A.875. In her official capacity, Defendant Feldon reviews and approves PRO program plans and plan amendments under ORS §§ 459A.875 and 459A.878; possesses inspection and enforcement authority over compliance with the Act under ORS § 459A.962; and is authorized to assess civil penalties of up to $25,000 per day for violations under ORS §§ 459A.962 and 468.130. Defendant Feldon's role in the administration and enforcement of the challenged scheme satisfies the "some connection" test of *Ex parte Young*, 209 U.S. 123 (1908). See also *Mecinas v. Hobbs*, 30 F.4th 890, 903–04 (9th Cir. 2022); *Matsumoto v. Labrador*, 122 F.4th 787, 803 (9th Cir. 2024).

20.     Feldon's enforcement authority continues against Lollicup and every producer who is not a member of the National Association of Wholesaler-Distributors ("NAWD") – a trade association that obtained a preliminary injunction against enforcement of the Act on February 6, 2026 in a separate action before this Court – as of that date. *NAWD v. Feldon*, No. 3:25-cv-01334-SI (D. Or. Apr. 6, 2026), ECF No. 134, at 6. On February 10, 2026 – four days after the entry of the NAWD preliminary injunction – DEQ publicly confirmed that "[t]he act remains in effect" and that "[t]he court issued a narrow injunction that temporarily pauses DEQ enforcement of the act against producers who are members of the National Association of Wholesaler-Distributors." On May 13, 2026, CAA delivered to Lollicup a "Notice of Unresolved Delinquency" stating that "CAA has initiated escalation of information related to your unresolved delinquency to the Oregon Department of Environmental Quality (DEQ)."

21.     No claim is asserted against the Oregon Environmental Quality Commission, its commissioners, the Oregon Attorney General, the Oregon Department of Environmental Quality as an entity, or Circular Action Alliance.

**STATUTORY AND REGULATORY FRAMEWORK**

**A.     The Act and Its Implementing Regulations**

22.     The Plastic Pollution and Recycling Modernization Act was enacted in 2021 and is codified at ORS §§ 459A.860–459A.975. The Act creates a statewide "extended producer responsibility" ("EPR") program under which "producers" of packaging, paper products, and food serviceware sold or distributed in Oregon are required to fund Oregon's recycling infrastructure through fees paid to a state-approved PRO.

23.     The Act defines "producer" broadly to include, among others, the brand owner or manufacturer of a covered product; in the absence of a domestic brand owner or manufacturer, the importer of the covered product; and, in some circumstances, the wholesaler or distributor who introduces a covered product into Oregon commerce. ORS §§ 459A.863(22), 459A.866.

24.     The Act exempts only narrowly defined small producers – including those with less than $5 million in gross revenue for the organization's most recent fiscal year, those that sold less than one metric ton of covered products in or into Oregon in the most recent calendar year, and a limited set of category-specific exemptions for nonprofits, public bodies, qualifying restaurants and food carts, and certain single-location retailers without online sales. ORS §§ 459A.863(32), 459A.872(1). Every other producer is required to either join an approved PRO or operate its own independent PRO. ORS § 459A.869(1).

25.     To qualify for approval as an independent PRO, an entity must represent at least 10% of the total market share of covered products in Oregon. ORS § 459A.869(12). A program-plan submission alone carries a $150,000 DEQ filing fee, exclusive of legal, consulting, and operational costs. OAR § 340-090-0690(1). As a practical matter, every producer that is not exempt under ORS § 459A.872 must contract with the single approved PRO – CAA.

26.     DEQ is authorized to approve or reject PRO program plans and plan amendments under ORS §§ 459A.875 and 459A.878; to inspect for compliance with the Act under ORS § 459A.962; and to impose civil penalties of up to $25,000 per day for violations under ORS §§ 459A.962 and 468.130.

27.     The implementing regulations adopted by the Environmental Quality Commission and codified at OAR §§ 340-090-0600 to 340-090-0940 do not supply the detail the statute lacks – they confirm it. The regulations require the PRO to use producer-reported supply data to "set fees for their producer members" in accordance with ORS § 459A.884(1). OAR § 340-090-0700(4)(b). The regulations further permit the PRO to offer "other fee adjustments to its member producers," OAR § 340-090-0910(3)(c), giving the PRO unbounded discretion to vary the financial burdens it imposes on competing companies. Most consequentially, the regulations expressly provide that the PRO's annual base-rate updates and individual producer fee adjustments do not constitute "method changes" and do not require a program-plan amendment or any DEQ approval. OAR §§ 340-090-0750(1), (2). DEQ plays no meaningful role in reviewing – let alone constraining – the PRO's fee decisions. The private PRO thus holds plenary authority to set, adjust, and reallocate fees among its producer members entirely outside the supervision of any government agency.

28.     By statute and by regulation, Oregon has thus committed core regulatory authority – fee setting, material classification, incentive design, and audit and enforcement triggers – to a private entity over which DEQ exercises no meaningful day-to-day oversight.

**B.     CAA and the Privately Administered Fee Scheme**

29.     CAA is a Delaware nonprofit corporation, headquartered in Washington, D.C., that was founded by the largest packaging and paper producers in the United States and that is governed by a board of directors drawn from those same producers. CAA is the only PRO approved to operate in Oregon.

30.     The CAA Oregon Program Plan (2025–2027), approved by DEQ on February 21, 2025, governs the administration of the Act for the initial three-year program cycle. The Program Plan applies a base-fee algorithm across more than 60 covered-material categories, with per-pound rates ranging from approximately $0.03 per pound for kraft paper, paperboard, and corrugated cardboard to as much as $1.38 per pound for certain plastic packaging categories such as expanded polystyrene.

31.     The detailed methodology by which CAA derives those rates is set forth in Appendix G of the Program Plan – Detailed Fee-Setting Methodology (confidential). Appendix G is not publicly disclosed; the Program Plan states only that "Appendix G is confidential and has been shared with DEQ separately." Producers cannot inspect, audit, or challenge the methodology by which their fees are calculated.

32.     To register with CAA, every producer must execute CAA's Participant Producer Agreement and the Oregon Addendum. The Oregon Addendum is a non-negotiable contract of adhesion. It binds the producer to CAA's fee determinations; shifts to the producer the reasonable, documented costs of any CAA audit that uncovers a discrepancy of the lower of 5% or $100,000 (Oregon Addendum § 4.2); subjects the producer to liquidated damages, audit costs, and enforcement referrals to DEQ for noncompliance (id. §§ 4.2, 5.6.2, 6.2.8); and forecloses judicial review of any "dispute, controversy, or claim arising out of or relating to" the Oregon Addendum, which must be resolved by binding arbitration (id. § 8).

33.     CAA's fees are retrospective. The 2025 program-year fees were calculated against the producer's 2024 covered-material volumes at rates fixed later; similarly, 2026 fees are calculated against 2025 volumes at rates fixed later. Producers cannot accrue, project, or pass through these costs in the ordinary course of business because the rate is not known when the activity giving rise to the obligation occurs.

34.     CAA may revise its fee schedules, reclassify materials, and adjust eco-modulation incentives unilaterally – without DEQ approval, without notice and comment, and without public disclosure. OAR §§ 340-090-0750(1), (2). DEQ approval is required only if CAA proposes an "[a]lternate approaches" to the membership-fee structure as a whole. OAR § 340-090-0750(2).

35.     CAA's founding members and board members are themselves regulated producers. They sit on both sides of the fee-setting table: as members of the body that sets the fees and as recipients of the eco-modulation credits, fee-reduction bonuses, and life-cycle-evaluation incentives that the methodology grants. Mid-size and smaller producers – including Lollicup – have no comparable access to or influence over the fee-setting machinery.

PAGE 10 – CLASS ACTION COMPLAINT

36.    There is no administrative remedy for a producer who disputes a CAA fee assessment, material classification, incentive denial, audit determination, or compliance referral. There is no agency tribunal. There is no formal opportunity to present evidence. There is no judicial review. The producer's sole "remedy" is binding arbitration under the Oregon Addendum, conducted by an arbitrator selected through CAA-prescribed procedures, and final.

C.    **Producer Obligations, Enforcement, and the Penalty Structure**

37.    The Act requires every covered producer to register with a PRO, to report covered-material weights and categories, to pay the assessed fees, and to comply with any operational requirements imposed by the PRO. ORS §§ 459A.866, 459A.869, 459A.884.

38.    A producer that fails to comply is subject to civil penalties of up to $25,000 per day under ORS §§ 459A.962 and 468.130. Those penalties are imposed by DEQ. *Id.*

39.    Each program year, covered producers must pay the assessed CAA fees in order to remain in good standing under the Act and avoid civil-penalty referral. Annual fee obligations for mid-size producers like Lollicup are significant.

40.    The Act applies to every covered producer in identical terms. There is no opt-out, no judicial-review forum, and no transitional accommodation for producers whose operations are national in scope and who cannot determine in advance whether a given unit of covered material will ultimately enter or remain in Oregon.

**LOLLICUP'S CONCRETE INJURY UNDER THE ACT**

41.    Lollicup is a "producer" under ORS §§ 459A.866(1)(a)(A) (packaging) and 459A.866(3) (food serviceware) subject to all of the Act's registration, reporting, fee-payment, and compliance obligations.

42.    On September 25, 2025, CAA registered Lollicup as a participant producer and issued Lollicup credentials to access the CAA Producer Portal. CAA assigned Lollicup a producer account through which it transmits invoices, delinquency notices, and other communications.

43.    On September 30, 2025, Lollicup executed the Participant Producer Agreement and the Oregon Addendum. The Oregon Addendum was a non-negotiable condition of CAA

participation compelled by Oregon law. The Oregon Addendum retroactively imposed compliance obligations on Lollicup: the first reporting deadline under OAR § 340-090-0870 was March 31, 2025 – five months before Lollicup executed the Oregon Addendum on September 30, 2025. The Participant Producer Agreement § 3.4 bound Lollicup to those pre-execution obligations as a condition of enrollment. The Oregon Addendum further requires that all disputes – including the extent of the parties' obligations under Oregon EPR law – be submitted to binding arbitration administered by JAMS in Portland, Oregon, with both parties waiving all rights to appellate review. Oregon Addendum § 8. Lollicup has not submitted covered-material data for either program year (2025 or 2026). Accordingly, CAA has not issued a formal fee invoice; the obligation to pay significant fees per program year will arise upon data submission or CAA estimation – whichever occurs first. CAA's civil-penalty referral to DEQ is not contingent on invoice issuance.

44.    On October 23, 2025, DEQ's Program Plan Lead for Paper and Packaging EPR, Nicole Portley, issued a written notification to Lollicup that Lollicup "may be out of compliance with Oregon's Recycling Modernization Act." The notification cited OAR § 340-090-0870 (the March 31, 2025 reporting deadline) and warned that "[p]roducers that remain out of compliance with the Act may face DEQ enforcement action, which may include civil penalties and a compliance order."

45.    For the 2024 covered-material reporting year, Lollicup's reported covered-material volume spans more than sixty CAA reporting categories.

46.    Between February 4, 2026 and April 21, 2026, CAA issued Lollicup three formal delinquency notices: a February 4, 2026 "Oregon Delinquency Notice" for the 2025 program year, citing ORS § 459A.869 and warning of escalation to DEQ; an April 16, 2026 "Reminder Delinquency Notice" confirming Lollicup remained "Out of Good Standing"; and an April 21, 2026 "Notice of Delinquency" for the Oregon 2026 program year, placing Lollicup in delinquent status across two program years. On February 19, 2026, CAA separately communicated to all producers – including Lollicup – that the NAWD preliminary injunction did not protect producers outside the NAWD membership and that the Act "remain[ed] in effect."

PAGE 12 – CLASS ACTION COMPLAINT

47.     On May 13, 2026, CAA issued Lollicup a "Notice of Unresolved Delinquency" stating that "CAA has initiated escalation of information related to your unresolved delinquency to the Oregon Department of Environmental Quality (DEQ)." Lollicup's file has been formally referred to Defendant Feldon's agency for enforcement under ORS §§ 459A.962 and 468.130.

48.     Lollicup faces imminent and concrete exposure to civil penalties of up to $25,000 per day. Lollicup's continued operation as a producer of covered materials in Oregon is incompatible with the Act's compliance scheme except through registration with CAA, execution of the Oregon Addendum, payment of fees calculated under CAA's confidential methodology, and submission to binding arbitration in lieu of judicial review.

49.     Lollicup operates no facility in Oregon. All Oregon-bound products – including approximately seventeen custom SKUs designed and manufactured exclusively for Oregon-based foodservice companies are shipped in interstate commerce from Lollicup's warehouses in Chino, California. To comply with the Act, Lollicup would be compelled to implement significant operational changes at those California-based facilities: segregating Oregon-destined inventory from the broader interstate distribution stream; conducting Oregon-specific covered-material weight tracking for its own-brand products for which Lollicup bears producer responsibility under ORS § 459A.866; performing the required producer-responsibility determination for each of the approximately seventeen custom-branded SKUs it manufactures for Oregon-based brand owners – confirming under Oregon's producer hierarchy that those brand owners, not Lollicup, bear producer responsibility for those products – a determination that nonetheless imposes compliance obligations on Lollicup's California facilities; and potentially reformulating or substituting materials in its own-brand product lines to reduce EPR fee exposure.

50.     Lollicup's compliance obligations under the Act are ongoing. Each program year the Act remains in force, Lollicup is required to pay fees calculated under CAA's confidential methodology, to absorb the operational burdens described in ¶¶ 47–48, and to remain exposed to civil-penalty referral under ORS §§ 459A.962 and 468.130.

PAGE 13 – CLASS ACTION COMPLAINT

51.     The injury is fairly traceable to Defendant Feldon. Feldon administers the Act and approved the CAA Oregon Program Plan that authorized the fees Lollicup is required to pay. ORS § 459A.878. Feldon's agency, through Program Plan Lead Nicole Portley, directly contacted Lollicup about its compliance status on October 23, 2025. Feldon possesses the civil-penalty enforcement authority that the May 13, 2026 CAA escalation now invokes. ORS §§ 459A.962, 468.130.

52.     The injury is redressable. A declaration that the Act is unconstitutional and a preliminary and permanent injunction against Feldon's enforcement of the Act would dissolve Lollicup's obligation to register with, contract with, and pay CAA, and would terminate Lollicup's exposure to civil penalties under ORS §§ 459A.962 and 468.130.

## THE NAWD INJUNCTION AND THE ENFORCEMENT GAP IT LEAVES

53.     On July 30, 2025, the National Association of Wholesaler-Distributors filed *NAWD v. Feldon*, No. 3:25-cv-01334-SI (D. Or.), challenging the Act as facially unconstitutional under the Dormant Commerce Clause, the Due Process Clause, the federal doctrine of unconstitutional conditions, the Equal Protection Clause, and the Oregon Constitution. NAWD filed an Amended Complaint on October 27, 2025 (ECF No. 26) and moved for a preliminary injunction on November 24, 2025 (ECF No. 33).

54.     On February 6, 2026, the Court issued Order 88 (ECF No. 88), which (a) granted Feldon's motion to dismiss the unconstitutional-conditions, equal-protection, and Oregon-Constitution claims (and dismissed the EQC commissioners as defendants), and (b) denied the motion to dismiss the Dormant Commerce Clause and Due Process claims and granted NAWD's motion for a preliminary injunction on those two claims. ECF No. 88, at 1–2.

55.     The Court applied the Ninth Circuit's serious-questions standard under *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011), and found that "[s]erious questions go to the merits of Plaintiff's claims, there is a likelihood of irreparable injury, and the balance of hardships tips sharply in favor of Plaintiff." ECF No. 88, at 2.

56.     On April 1, 2026, in Doc. 131 denying the American Forest & Paper Association's motion to intervene, the Court expressly held that "nothing about NAW's case precludes AF&PA from bringing its own constitutional suit challenging enforcement of the Act," and that "[i]f the Court rules in favor of NAW, the Act may be held to be facially unconstitutional (which likely would relieve AF&PA of its obligations under the Act altogether). Alternatively, AF&PA may seek to assert an as-applied judgment in its own suit based on offensive, non-mutual issue preclusion." ECF No. 131, at 5.

57.     On April 6, 2026, in Order 134, the Court clarified the scope of the NAWD preliminary injunction. The Court enjoined Feldon from enforcing the Act "against Plaintiff National Association of Wholesaler-Distributors and the members of that organization that were members as of February 6, 2026," but held that Feldon "may continue to enforce the . . . Act against Members of [NAWD] who joined the organization after February 6, 2026." ECF No. 134, at 6.

58.     Lollicup is not now and never has been a member of NAWD. Lollicup is therefore outside the NAWD preliminary injunction. So are the thousands of other producers who are subject to the Act but are not members of NAWD as of February 6, 2026.

59.     Feldon has expressly confirmed her intent to continue enforcing the Act against non-NAWD producers. See, e.g., *NAWD v. Feldon*, ECF No. 134, at 6 (Apr. 6, 2026) (clarifying that the injunction does not reach non-NAWD producers); DEQ Press Release (Feb. 10, 2026) (stating that "[t]he act remains in effect" and that the injunction "temporarily pauses DEQ enforcement of the act" only as to NAWD members). CAA, acting under DEQ's supervision and approval, has likewise expressly confirmed its intent to continue collecting fees, issuing delinquency notices, and referring non-NAWD producers to DEQ for civil-penalty enforcement.

60.     This action implements the doctrinal pathway the Court identified in Order 131. Lollicup brings this action on behalf of itself and the class of producers excluded from the NAWD preliminary injunction, seeking the same declaratory and injunctive relief as to the same Act, on the same two constitutional theories the Court found capable of supporting that relief at the pleading stage.

PAGE 15 – CLASS ACTION COMPLAINT

## CLASS ACTION ALLEGATIONS

61.    Lollicup brings this action on behalf of itself and as a representative of the following Class under Federal Rule of Civil Procedure 23(b)(2):

**The Class:** All persons and entities classified as "producers" under ORS § 459A.866 that exceed the de minimis thresholds set forth in ORS § 459A.872 and that are not afforded the protection of the preliminary injunction entered in *National Association of Wholesaler-Distributors v. Feldon*, No. 3:25-cv-01334-SI (D. Or. Feb. 6, 2026), as clarified at ECF No. 134 (Apr. 6, 2026).

62.    Excluded from the Class and subclasses are (a) Defendant, her counsel, and her immediate family members; (b) the judicial officer assigned to this action and the judicial officer's immediate family and staff; (c) members of NAWD who were members as of February 6, 2026; (d) producers exempt from the Act under ORS § 459A.872; and (e) CAA and its directors, officers, and employees.

### A.    Numerosity – Rule 23(a)(1)

63.    The Class is so numerous that joinder of all members is impracticable. The Act applies to every producer that introduces covered packaging, paper products, or food serviceware into Oregon commerce above the de minimis thresholds set by ORS § 459A.872. Indeed, the CAA has acknowledged in writing to Lollicup that the *NAWD* preliminary injunction protects only "a small faction of producers."

64.    Moreover, ORS § 459A.869(12) requires a producer to hold at least 10% market share to form an independent PRO – meaning the statute itself presupposes at least ten large producers in the market. Because producer size follows a long-tail distribution, the total number of regulated entities by count runs into the hundreds or thousands. Public submissions to this Court in *NAWD v. Feldon* – *including* filings by the American Forest & Paper Association, the Oregon Business & Industry Association, the Northwest Grocery Retail Association, and Food Northwest (ECF Nos. 101–118) – describe a regulated producer population spanning multiple industries and all 36 Oregon counties.

65.     Joinder of every regulated producer outside the NAWD preliminary injunction would be impracticable. Class members are dispersed across the United States, operate in multiple industries, and face the same uniform regulatory burden – making class adjudication the only practical means of obtaining the indivisible injunctive relief sought here. The members of the Class are also ascertainable because the Class is defined by reference to objective criteria.

**B.     Commonality – Rule 23(a)(2)**

66.     The action presents common questions of law that can be resolved on the basis of evidence common to the Class, including whether Defendant has engaged in the uniform conduct and practices alleged herein or is otherwise actionable under applicable federal law and, more specifically:

a.     whether the Act and its implementing regulations facially or as applied violate the Dormant Commerce Clause by burdening interstate commerce in a manner clearly excessive in relation to the putative local benefits, *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970);

b.     whether the Act imposes an unlawful tariff or excessive user fee on interstate commerce, *Nw. Airlines, Inc. v. County of Kent*, 510 U.S. 355, 369 (1994);

c.     whether the Act discriminates in effect against interstate commerce, *Comptroller v. Wynne*, 575 U.S. 542 (2015); *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994);

d.     whether the Act has an impermissible extraterritorial effect on packaging and sourcing decisions made outside Oregon, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023);

e.     whether the Act unconstitutionally delegates regulatory authority to a self-interested private actor in violation of the Due Process Clause, *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936);

f.       whether the Act denies producers constitutionally adequate procedural protections under *Mathews v. Eldridge*, 424 U.S. 319 (1976), and the fair-notice doctrine of *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012);

g.       whether Feldon's continued enforcement of the Act against producers outside the *NAWD* preliminary injunction is constitutional; and

h.       the scope of declaratory and injunctive relief required to remedy the foregoing violations.

67.       These common questions are capable of class-wide resolution because they arise from Defendant's uniform conduct and do not depend on individualized proof.

**C.       Typicality – Rule 23(a)(3)**

68.       Lollicup's claims are typical of the claims of the Class. Lollicup is subject to the Act and its implementing regulations on the same terms as every other class member. Lollicup is required to register with the same single PRO, to execute the same Oregon Addendum, to pay fees calculated under the same confidential methodology, to forgo judicial review in favor of the same binding arbitration provision, and to face the same civil-penalty exposure under ORS §§ 459A.962 and 468.130. The constitutional violations Lollicup challenges arise from the uniform operation of the Act and the regulations, not from any feature unique to Lollicup. In other words, Lollicup's claims, and the claims of the members of the Class, originate from the same conduct, practice, and procedure on the part of Defendant. Lollicup's claims are also based on the same theories as the claims of the members of the Class, and Lollicup suffered the same injuries as the members of the Class.

**D.       Adequacy – Rule 23(a)(4)**

69.       Lollicup will fairly and adequately protect the interests of the Class, and Lollicup seeks the same relief as the other members of the Class. Lollicup has no interest antagonistic to or in conflict with any class member, directly or indirectly. All class members share a common interest in invalidating the Act and obtaining injunctive relief against its enforcement. Lollicup has retained counsel experienced in federal class actions, complex civil litigation, and constitutional

challenges to state regulatory schemes, and counsel will vigorously prosecute this action on behalf of the Class. *See* Fed. R. Civ. P. 23(g). Lollicup's counsel will assert, protect, and otherwise represent the members of the Class. Lollicup will vigorously pursue the claims of the members of the Class.

### E.    Rule 23(b)(2) Requirements

70.    Defendant Feldon "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The challenged statutory scheme applies to every class member in identical terms. The relief sought – a declaration of unconstitutionality and an injunction against enforcement – is indivisible: it cannot be granted to Lollicup without also benefitting every other class member, and it cannot be tailored to individual class members because the statutory enforcement scheme is uniform. In other words, each individual class member would be entitled to the same injunction or declaratory judgment against Defendant.

71.    Lollicup does not seek monetary damages on behalf of the Class.

**FIRST CAUSE OF ACTION**
**(Violation of the Dormant Commerce Clause)**
**(U.S. Const. art. I, § 8)**

72.    Lollicup re-alleges and incorporates by reference Paragraphs 1 through 72.

73.    The Commerce Clause vests in Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. By negative implication, the Commerce Clause prohibits state regulation that discriminates against, unduly burdens, or has impermissible extraterritorial effects upon, interstate commerce. *See S. Dakota v. Wayfair, Inc.*, 585 U.S. 162, 172–73 (2018); *see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 515–18 (2019).

74.    The Act violates the Dormant Commerce Clause on each of four independent, overlapping grounds.

PAGE 19 – CLASS ACTION COMPLAINT

**A.    The Act's Burden on Interstate Commerce Is Clearly Excessive in Relation to Putative Local Benefits – Pike Balancing**

75.    The Act imposes substantial burdens on the interstate movement of packaging, paper products, and food serviceware. Packaging is the instrumentality by which goods move in interstate commerce, and *Pike* balancing applies with particular force where a state law burdens "the very instrumentalities of interstate commerce." Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 526 (1959).

76.    The Act compels producers operating nationwide to segregate, track, and report covered-material weights and categories on an Oregon-specific basis, even where the producer does not control the ultimate destination of the products it places into commerce. Producers are exposed to double-counting and double-payment for products that are shipped through Oregon but consumed elsewhere, and for products that are reported by an upstream producer in another jurisdiction but reassigned to the Oregon producer under CAA's hierarchical methodology.

77.    The Act compels producers to make packaging design, material sourcing, and pricing decisions in conformity with CAA's classification scheme – decisions that govern the producer's national operations, not merely its Oregon sales – in order to qualify for eco-modulation credits, avoid penal classifications, or comply with the Act's reporting requirements.

78.    The putative local benefits of the Act are limited and largely speculative at this early stage of the program. DEQ has acknowledged on the public rulemaking record that it could not determine the overall fiscal impacts of the EPR program; required no comprehensive economic-impact analysis of the program on regulated businesses; and committed the calibration of fees and incentives to CAA's confidential methodology, which DEQ neither reviewed for reasonableness nor required CAA to substantiate. See Or. Env't Quality Comm'n, EQC Rulemaking, Action Item G (Nov. 16–17, 2023).

79.    The Act's burdens on interstate commerce – multistate compliance complexity, double-counting and double-payment risk, reconfiguration of national supply chains, and the loss

of national-scale efficiency – are clearly excessive in relation to whatever speculative recycling-rate gains the Act may eventually produce. *See Pike*, 397 U.S. at 142.

**B.      The Act Operates as an Excessive User Fee and Unlawful Tariff**

80.      The Act imposes "fees" that are not user fees in any constitutionally cognizable sense. To be permissible under the Dormant Commerce Clause, a charge imposed on interstate commerce must, among other requirements, be "based on some fair approximation of use of the facilities" and "not [be] excessive in relation to the benefits conferred." *Nw. Airlines, Inc. v. County of Kent*, 510 U.S. 355, 369 (1994).

81.      The CAA fees funded by Oregon producers fund a brand-new statewide waste-management infrastructure that did not exist when the Act was enacted, that is not yet operational, and whose facility-level costs are not yet known. On information and belief, CAA has acknowledged significant uncertainty in its market share projections due to limited data available when setting the initial fee schedule. Producers pay fees today against costs that have not yet been incurred and a system that has not yet been built – and the differential per-pound rates (ranging from $0.03 to $1.38 per pound) bear no documented "fair approximation" to any facility-specific use.

82.      The Act's fee structure operates as a tariff on the introduction of covered materials into Oregon commerce. Like the tax scheme invalidated in *Wynne*, the Act is "inherently discriminatory and operates as a tariff," *Comptroller v. Wynne*, 575 U.S. 542, 563 (2015), and tariffs are "'[t]he paradigmatic example of a law discriminating against interstate commerce,'" *id.* (quoting *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994)); *see also Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79 (2d Cir. 2009) (excessive-user-fee analysis).

**C.      The Act Discriminates in Effect Against Interstate Commerce**

83.      The Act facially applies to "producers" without regard to in-state or out-of-state status, but its practical operation discriminates against interstate commerce. Oregon could have funded its recycling-modernization program through generally applicable taxes, point-of-sale fees

PAGE 21 – CLASS ACTION COMPLAINT

on retailers or consumers, or general appropriations. Instead, Oregon chose a scheme that concentrates the fee burden on participants in upstream interstate supply chains – brand owners, manufacturers, wholesalers, distributors, and importers – most of whom are domiciled outside Oregon.

84. The Act's hierarchical producer-of-record system effectively shifts compliance costs to out-of-state producers when the upstream entity is unregistered with CAA, while leaving Oregon-domiciled retailers and consumers untaxed. *See* OAR § 340-090-0860. A state regulation that, in practical effect, imposes its burdens disproportionately on the participants in interstate commerce while sparing in-state actors is invalid under the Dormant Commerce Clause. *See Comptroller v. Wynne*, 575 U.S. 542, 563 (2015); *see also C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390–91 (1994).

### D.    The Act Has Impermissible Extraterritorial Effect

85. The Act forces producers to make packaging design, material sourcing, and pricing decisions outside Oregon – at the manufacturing facility, at the brand-owner headquarters, at the distribution hub – in order to comply with an Oregon-specific classification system administered by a Delaware-incorporated private organization headquartered in Washington, D.C. Because producers cannot segregate Oregon-bound product at the design-and-sourcing stage with perfect accuracy, the Act compels nationwide conformity to its standards. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374–77 (2023).

86. The Act's "in-effect" extraterritoriality is heightened by the Act's overlapping reach with developing EPR programs in other states and by CAA's status as the predominant approved PRO across multiple state programs. National producers face conflicting state-specific classifications that cannot be reconciled at the level of product design without reducing the producer's operations to the lowest common denominator. The Act thereby "deprive[s] businesses and consumers in other States of whatever competitive advantages they may possess." *Pork Producers*, 598 U.S. at 374 (citation omitted).

87.     By any or all of these four overlapping theories, the Act violates the Dormant Commerce Clause and is unconstitutional both on its face and as applied to Lollicup and the proposed Class.

88.     Defendant's actions have caused, and continue to cause, Lollicup and the Class to suffer irreparable injury. Lollicup and the Class have no adequate remedy at law.

89.     Defendant and the Class are entitled to injunctive and/or declaratory relief to avoid further injury.

90.     Lollicup is entitled to attorney's fees pursuant to 42 U.S.C. § 1988.

**SECOND CAUSE OF ACTION**
**(Violation of the Due Process Clause of the Fourteenth Amendment)**
**(U.S. Const. amend. XIV)**

91.     Lollicup re-alleges and incorporates by reference Paragraphs 1 through 91.

92.     The Fourteenth Amendment prohibits any State from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The touchstone of due process is "protection of the individual against [the] arbitrary action of [the] government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). The Due Process Clause was intended to prevent government officials "from abusing [their] power, or employing it as an instrument of oppression." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992)). It also requires a meaningful procedure for challenging government action. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982). Lollicup and the Class have fundamental liberty and property interests, protected by the Due Process Clause, in conducting their lawful businesses. The Act violates both the substantive and procedural components of the Due Process Clause in two intertwined respects: (a) it delegates core regulatory authority to a self-interested private actor in violation of substantive due process, and (b) it denies regulated producers the procedural protections required by *Mathews v. Eldridge* and the fair-notice doctrine.

PAGE 23 – CLASS ACTION COMPLAINT

A.    **Substantive Due Process – Private Delegation to a Self-Interested Actor**

93.    "This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). The Supreme Court has long held that a State cannot vest regulatory authority in private persons whose self-interest in the outcome creates a structural conflict with the interests of those they are empowered to regulate. *See Eubank v. City of Richmond*, 226 U.S. 137, 143–44 (1912); *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 122 (1928); *Gen. Elec. Co. v. N.Y. Dep't of Lab.*, 936 F.2d 1448, 1455–56 (2d Cir. 1991).

94.    The Act delegates to CAA – a private nonprofit corporation founded and governed by the largest producers in the regulated industries – the authority to (i) set per-pound fees on covered materials, ORS § 459A.884; OAR § 340-090-0700(4)(b); (ii) classify covered materials and assign them to fee categories, Program Plan at 191–98 and Appendix G (*undisclosed*); (iii) grant and deny eco-modulation incentives, fee-reduction bonuses, and life-cycle-evaluation credits, OAR § 340-090-0910(3)(c); (iv) audit producers and assess audit costs against them (Oregon Addendum § 4.2); (v) impose liquidated damages on producers (*id.* §§ 4.2, 5.6.2, 6.2.8); (vi) refer producers to DEQ for civil-penalty enforcement (*id.* § 6.2.8); and (vii) unilaterally revise fees, classifications, and incentives without DEQ approval, OAR §§ 340-090-0750(1), (2).

95.    CAA's founding members and board members occupy both sides of the regulatory relationship: they sit on the body that sets the fees, and they receive the incentives and fee adjustments that the body grants. Mid-size and smaller producers – including Lollicup – have no comparable access to the fee-setting machinery and no representation on the board that sets it.

96.    DEQ's nominal oversight does not cure the structural defect. DEQ does not approve routine fee adjustments (OAR §§ 340-090-0750(1), (2)); does not approve eco-modulation or incentive changes (OAR § 340-090-0910(3)(c)); does not require CAA to disclose its fee methodology (see CAA Oregon Program Plan, App. G at 86 ("Appendix G is confidential and has

PAGE 24 – CLASS ACTION COMPLAINT

been shared with DEQ separately")); does not require any economic-impact analysis of the program (see Or. Env't Quality Comm'n, EQC Rulemaking, Action Item G (Nov. 16–17, 2023)); and provides no administrative-appeal mechanism for an aggrieved producer.

97.    The Act's delegation to CAA is not the kind of delegation the Supreme Court upheld in *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), where the private code authorities "function[ed] subordinately to the Commission" that retained price-setting authority, agency surveillance, and ultimate control of the program. *Id.* at 399. The Act's scheme is the opposite: CAA, not DEQ, sets fees, classifies materials, designs incentives, audits producers, and triggers enforcement, with no meaningful agency check on its day-to-day exercise of those powers. The structural defect is the one *Carter Coal*, *Eubank*, and *Roberge* condemned – regulatory authority vested in private actors whose financial interests are adverse to the regulated parties they govern.

**B.      Procedural Due Process – *Mathews* Balancing and Fair Notice**

98.    "[S]ome form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The constitutional adequacy of the procedures the State affords is measured by three factors: (a) the private interest affected by the official action; (b) the risk of erroneous deprivation through the procedures used and the probable value, if any, of additional procedural safeguards; and (c) the government's interest, including the fiscal and administrative burdens that the additional procedural safeguards would entail. *Id.* at 335.

99.    The private interest at stake – Lollicup's and the Class's interest in access to the Oregon market and in freedom from arbitrary and unrecoverable fees and penalties – is substantial. CAA's fees, paid annually, total hundreds of thousands of dollars per producer for mid-size producers like Lollicup. Once paid, those fees are unrecoverable – sovereign immunity forecloses any prospective remedy to undo the loss.

100.    The risk of erroneous deprivation under the Act's procedures is high and the value of additional safeguards is substantial. The fee methodology is confidential; producers cannot

PAGE 25 – CLASS ACTION COMPLAINT

inspect it, audit it, or test it for arithmetic or methodological error. See CAA Oregon Program Plan, App. G at 86 ("Appendix G is confidential and has been shared with DEQ separately"). The fees are retrospective; producers cannot accrue against them in the ordinary course of business or pass them through to customers in advance. The PRO may revise fees, reclassify materials, and adjust incentives unilaterally; producers cannot rely on the rates and classifications under which they ordered the prior year's production. OAR §§ 340-090-0750(1), (2). And there is no administrative or judicial review of any fee determination – only binding arbitration under a contract of adhesion that the producer was compelled by law to sign. Oregon Addendum § 8. *See K.W. ex rel. D.W. v. Armstrong*, 298 F.R.D. 479 (D. Idaho 2014), *aff'd*, 789 F.3d 962, 974 (9th Cir. 2015).

101.    The State's interest in the existing procedures is minimal. Oregon could readily provide notice-and-comment publication of the fee methodology, agency review of fee revisions, an administrative-appeal mechanism for disputed assessments, and judicial review under the Oregon APA – all without compromising the State's interest in efficient program administration. The State's choice to delegate these functions to CAA without procedural safeguards is not justified by any countervailing administrative imperative.

102.    The Act also violates the Due Process Clause's fair-notice requirement. "[R]egulated parties should know what is required of them so they may act accordingly." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Lollicup cannot know what its 2025 or 2026 fee obligations are or will be because CAA's methodology is confidential and CAA may revise the rates unilaterally and retrospectively. The Act does not give producers fair notice of "what is required of them," *id.*, in either temporal or substantive terms.

103.    By failing to provide notice-and-comment process on the fee methodology, by foreclosing judicial review of CAA's assessments, by imposing fees on a retrospective basis at rates fixed later, and by delegating to a self-interested private actor the authority to revise the fees unilaterally, the Act violates both the procedural and substantive components of the Due Process Clause of the Fourteenth Amendment.

104.    The Act is therefore unconstitutional under the Due Process Clause, both on its face and as applied to Lollicup and the proposed Class.

105.    Defendant's actions have caused, and continue to cause, Lollicup and the Class to suffer irreparable injury. Lollicup and the Class have no adequate remedy at law.

106.    Defendant and the Class are entitled to injunctive and/or declaratory relief to avoid further injury.

107.    Lollicup is entitled to attorney's fees pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Lollicup, on behalf of itself and the proposed Class, respectfully requests that this Court:

A.    Certify this action as a class action under Federal Rule of Civil Procedure 23(b)(2), with Lollicup as Class Representative and Lollicup's counsel as Class Counsel under Rule 23(g);

B.    Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that Oregon's Plastic Pollution and Recycling Modernization Act, ORS §§ 459A.860–459A.975, and its implementing regulations, OAR §§ 340-090-0600 to 340-090-0940, are unconstitutional both on their face and as applied to Lollicup and the Class under the Dormant Commerce Clause and the Due Process Clause of the Fourteenth Amendment;

C.    Issue a preliminary injunction restraining Defendant Feldon, and all persons acting in concert or participation with her, from enforcing the Act and its implementing regulations against Lollicup and the proposed Class, including from administering, collecting, demanding, or referring for collection any fees imposed by CAA or any other PRO; from assessing or pursuing any civil penalty under ORS §§ 459A.962 and 468.130; from issuing any compliance order or notice of noncompliance; and from approving any program-plan amendment that further entrenches the challenged scheme – pending final judgment in this action;

D.    Issue a permanent injunction prohibiting Defendant Feldon, and all persons acting in concert or participation with her, from enforcing the Act and its implementing regulations against Lollicup and the Class on the grounds identified above;

PAGE 27 – CLASS ACTION COMPLAINT

E.      Waive the security required by Federal Rule of Civil Procedure 65(c), or in the alternative require only a nominal bond, in light of the public-interest nature of this constitutional litigation, *see Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005);

F.      Award Lollicup and the Class their costs and attorneys' fees under 42 U.S.C. § 1988 and any other applicable authority; and

G.      Grant such other and further relief as the Court deems just and proper.


DATED this 25th day of June, 2026

Respectfully submitted,


By:   *s/ Philip S. Van Der Weele*
      Philip S. Van Der Weele, OSB No. 863650
      phil.vanderweele@klgates.com
      K&L GATES LLP
      One SW Columbia Street, Suite 1900
      Portland, OR 97204
      Telephone: (503) 228-3200
      Facsimile: (503) 248-9085

      Kevin A. Adams, *pro hac vice* forthcoming
      kadams@mortensontaggart.com
      Robert Schultz, *pro hac vice* forthcoming
      rschultz@mortensontaggart.com
      MORTENSON TAGGART ADAMS LLP
      300 Spectrum Center Drive, Suite 1200
      Irvine, CA 92618
      Telephone: (949) 774-2224
      Facsimile: (949) 774-2545

      *Attorneys for Plaintiff Lollicup USA, Inc. and the Proposed Class*


PAGE 28 – CLASS ACTION COMPLAINT